**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MIG, LLC and ITC Cellular, LLC, [1] | Case No. 14-11605 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF NATALIA ALEXEEVA
IN SUPPORT OF THE DEBTORS' CHAPTER 11
PETITION AND REQUEST FOR FIRST DAY RELIEF**

NATALIA ALEXEEVA, hereby declares, under penalty of perjury, as follows:

1.      I am the Chief Restructuring Officer (the "**CRO**") of debtor MIG, LLC ("**MIG**"), which is the sole and managing member of debtor ITC Cellular, LCC ("**ITC Cellular**" and, together with MIG, the "**Debtors**").  I submit this affidavit to provide the Court with information concerning the Debtors to support the Debtors' petitions and the relief requested by the Debtor in certain "first" and "second" day applications and motions (collectively, the "**Motions**").

2.      I have worked for MIG and its predecessor entities since 2001, first as Associate General Counsel and later as General Counsel, Vice President and Secretary.  I have served as CRO of MIG since June 21, 2014.  In addition to the personal knowledge that I have acquired while working for the Debtors, I also have knowledge of, and familiarity with, the Debtors' books and records, and financial and operational affairs.  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, other relevant documents, and other information prepared or collected by the Debtors' employees, or upon my opinion based upon my experience with the Debtors' operations

---

[1]      The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: MIG, LLC. (5301) and ITC Cellular, LLC (4611).

and financial condition.  As described above, I have relied in part upon others to accurately record, prepare, and collect any such documentation and other information.

3.      As CRO, I am authorized to submit this Declaration on behalf of the Debtors.  If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

4.      Section I of this Declaration provides a general overview of the Debtors.  Section II describes the business of the Debtors, the developments which led to the Debtors' Chapter 11 filing, and our goals in these chapter 11 cases.  Section III sets forth facts relevant to consideration of the Motions.

## I.      **EXECUTIVE SUMMARY**

5.      Debtor MIG is a limited liability company organized under the laws of the State of Delaware.  MIG owns 100% of the membership interests in Debtor ITC Cellular, a Delaware limited liability company. ITC Cellular in turn owns 46% of the membership interests of non-debtor International Telcell Cellular, LLC (**"International Telcell"**).  International Telcell, directly and indirectly through its wholly owned non-debtor subsidiary Telcell Wireless, LLC, owns all the issued and outstanding equity interests of non-debtor Magticom Ltd. (**"Magticom"**), the leading mobile telephony company in the Republic of Georgia (**"Georgia"**).  The remaining ownership stake of International Telcell is held 51% by Dr. George Jokhtaberidze (**"Dr. Jokhtaberidze"**), a Georgian national who founded Magticom and 3% by Gemstone Management Ltd., an entity formed by certain former management of Magticom.  The Debtors' value is derived solely from their interests in International Telcell.

6.     Formerly known as MIG, Inc., MIG was a debtor in a previous case captioned *In re MIG, Inc.*, Case No. 09-12118 (KG) (Bankr. D. Del) (the "**2009 Chapter 11 Case**").   On November 19, 2010, the Court confirmed the *Modified Joint Second Amended Plan of Reorganization for MIG* (the "**Joint Plan**") [Case No. 09-12118 ECF No. 1209].   The effective date of the Plan occurred on December 31, 2010.   Pursuant to the Joint Plan, MIG was converted to a Delaware limited liability company. The 2009 Chapter 11 Case was closed on July 27, 2011 [Case No. 09-12118 ECF No. 1501].

7.     Under the Joint Plan, MIG issued its Senior Secured Cash/PIK Notes Due 2016 (the "**Notes**"), pursuant to the Indenture, dated as of December 31, 2010 (the "**Indenture**"), among MIG, as Issuer, ITC Cellular, as Co-Obligor, and the Bank of New York Mellon ("**BONY**" or the "**Indenture Trustee**"), as Trustee, Collateral Agent, Registrar, Paying Agent and Note Accounts Bank.   The Notes are secured by, among other things, cash held in certain collateral accounts and pledges of the equity interests in MIG, MIG's equity interests in ITC Cellular, and ITC Cellular's rights to distributions from International Telcell.

8.     The Debtors' capital structure is highly-leveraged.   The principal amount of the Notes as of June 30, 2014, was $252.4 million.   In addition, on June 30, 2014, the Debtors became liable for the payment of over $11 million in cash interest and $13 million in payment-in-kind interest payable through the issuance of additional Notes.   The Debtors do not have sufficient liquidity to make the June 30 cash interest payment because the Debtors have not received distributions from Magticom due to an ongoing dispute with Dr. Jokhtaberidze over whether such distributions are required to be made.   In addition, the Debtors' growing leverage makes a restructuring inevitable.   These issues have been exacerbated by the deterioration in the relationships between and among the Debtors' various constituencies, which has hampered the Debtors' ability to negotiate an out-of-court solution.

9.     The Debtors filed these chapter 11 cases to conduct a marketing process to seek a transaction which will alleviate the Debtors' challenges.  The Debtors intend to pursue a sale transaction either to a buyer or through a credit bid, but are also willing to consider other restructuring transactions.  The Debtors believe that chapter 11 is the only way to bring the constituents together and to solicit and consummate a transaction that maximizes value.

## II.   BACKGROUND

**A.     The Debtors' Corporate History, Structure and Assets.**

10.     The organizational structure of the Debtors and certain non-debtor affiliates depicted on the chart annexed hereto as **Exhibit A**.

11.     MIG was organized in 1929 as a corporation under the laws of the Commonwealth of Pennsylvania, was reincorporated in 1968 under the laws of the state of Delaware, and was converted to a Delaware limited liability company at the end of December 2010 upon the effective date of the Joint Plan in the 2009 Chapter 11 Case.

12.     Prior to January 2009, MIG operated under the name "Metromedia International Group, Inc." and prior to 1995, MIG operated under the names "The Actava Group Inc." and "Fuqua Industries, Inc."  Until late 1990s, MIG owned, operated and sold dozens of companies in diverse industries, including entertainment business, photo finishing, lawn and garden equipment and sporting goods.  In 1997 and 1998, MIG consummated the sale of substantially all of its U.S.-based entertainment assets and began focusing on expanding into emerging market communications and media businesses.  By 2005, all of MIG's operating businesses were located in the Republic of Georgia and operated through its subsidiaries and affiliates.

13.     As of the Petition Date, MIG's sole valuable asset, beyond its existing cash, is its indirect interest in Magticom.[2]

14.     As of the Petition Date, the Debtors had a total of twelve employees and independent contractors who oversee their operations and investments. Two are based in the United States and the rest are based in London, England or Tbilisi, Georgia. The Debtors incur on-going operating costs of approximately $4 million per annum related to their investment activities and the administration of certain claims related to workers compensation and retirement benefits arising from their past business activities.[3]

15.     The Debtors are dependent on distribution from International Telcell to meet their expenses and satisfy claims. As of June 30, 2014, the Debtors have approximately $8.2 million in accounts at BONY which are subject to the Account Control Agreements (defined below) in favor of the Indenture Trustee. Of that amount, $4 million is reserved for certain potential tax liability and not available for use prior to September 30, 2014. The Debtors also have $1.3 million in their operating disbursement account that is not subject to the Account Control Agreements and is available for use to pay their operating expenses and restructuring expenses in these cases. The Debtors' Bank Accounts and Cash Management System (each as defined below) are more fully described in section III below.

---

[2]     MIG also has a wholly owned subsidiary Tag Holdings, Inc. ("**Tag**"). Tag owns a 17 acre plot of land in Opelika, Alabama, known as the "Orbatron Stockpile Site." MIG believes this land (and therefore its interest in Tag) is worthless.

[3]     As discussed above, until 2002, MIG had substantial operations in the United States. As a result of those operations, MIG still has certain pension and workers' compensation liabilities (the "**Historical Liabilities**"). Under the Joint Plan, certain of these liabilities were reinstated. First, MIG has continuing obligations related to various pension benefits that MIG offered to certain executives over the course of its history. MIG's monthly liability to these pension beneficiaries is approximately $19,200. MIG estimates that its total liability for these pension obligations is less than approximately $2.8 million based on actuarial estimates. Second, MIG has liability for outstanding workers' compensation claims related to its past practice of self-insuring its business risks. MIG estimates the total liability for these claims is less than approximately $165,000. The workers' compensation obligations are largely secured by cash collateralized bonds.

16.     All of the membership interests in MIG are owned by Caucuscom Ventures, L.P. ("**Caucuscom**").[4]  Caucus Carry Management LP ("**Caucus Carry**") is the general partner of Caucuscom.  The limited partners of Caucus Carry are (a) Yola Investments SARL ("**Yola**), (b) Gtel LP ("**Gtel**"), and (c) Shenton Park Company, Inc. ("**Shenton Park**").  Yola is an investment group formed by UK private equity group, Sun Capital Partners Ltd. ("**Sun**").  Gtel is an investment group formed by Salford Capital Partners, Inc. ("**Salford**").  Shenton Park Company, Inc. ("**Shenton Park**") is an investment group formed by the late Georgian billionaire Badri Patarkashvilli and now controlled by his estate.

17.     Caucuscom was formed in 2007 to pursue a transaction with MIG.  Pursuant to its formation documents, the Caucuscom partnership was set to expire on August 15, 2013.  Under the terms of the Caucuscom partnership agreement, the consent of each of the limited partners, Yola, Gtel and Shenton Park was required to extend the partnership.  In November 2012, Shenton Park informed MIG that as a result of its dissatisfaction with its investment in Magticom through MIG and the relationship between the various entities in MIG's capital structure, it would not agree to prolong the Caucuscom partnership.  Through a series of amendments, the partners in Caucuscom, including Shenton Park, elected to extend the termination of Caucuscom until April 15, 2014.  On April 24, 2014, Shenton Park informed MIG that it had not agreed to extend the Caucuscom partnership past its April 15, 2014 expiration.

18.     As a result of the expiration of the Caucuscom partnership, Dr. Jokhtaberidze has asserted that an ITC Cellular Change of Control (as defined below) has occurred and that such ITC Cellular Change of Control results in the loss of the Debtors' minority protections under the International Telcell LLC Agreement (as defined below).  Due to the ongoing dispute over

---

[4]     Until 2007, shares of MIG's common stock were publicly traded.  In late 2007, MIG was acquired by Caucuscom in a going private transaction.

whether an ITC Cellular Change of Control has occurred, the Debtors have not received the expected distribution from Magticom attributable to the second, third and fourth quarters of 2013 and the first quarter of 2014.

## B.    Magticom

19.    Headquartered in Tbilisi, Georgia, Magticom is the leading mobile telephony operator in Georgia, and is also the largest telephone operator (mobile or fixed) in Georgia, as measured by revenues and traffic volumes.  It provides services to businesses and consumers nationwide.  Magticom's network covers essentially all populated territories of Georgia, enabling country-wide wireless access to the company's mobile telephony, roaming services and related information services.

### 1.    *Magticom's Operations*

20.    Magticom currently serves 2.4 million subscribers with a network that covers 97% of the populated regions in Georgia.  95% of Magticom's retail customers use pre-pay cash accounts, which significantly reduces the credit risk to Magticom.  Magticom is well-known for high quality products, superior coverage, leading technology, and excellent customer service.  It has a history of being first in market with new products and technologies, has a strong distribution network, and best-in-class products.

21.    Magticom offers mobile services under three main brands - Magti, Bali and Bani:

- Since 1997, Magti has functioned as the premium mobile brand.  It provides high quality services to individuals, corporations, and Georgian government employees.

- Established in 2005, Bali targets the youth segment of the mobile market and offers attractive rates for communicating in a group format.

- Launched in 2010, Bani caters towards price-oriented subscribers. It aims to match all other competitive offerings for the budget segment.

22.    In addition, Magticom offers fixed wireless and satellite TV services through its Magti Fix and MagtiSat product lines:

- Introduced in 2008, Magti Fix infrastructure provides fixed wireless telephony services and high speed internet, which allow for the operation of wireless devices in fixed locations such as homes and offices. It is particularly viable in undeveloped areas that lack adequate PSTN infrastructure.

- Established in 2012, MagtiSat offers high definition satellite television services. MagtiSat launched three new movie channels this year.

### 2.    *Ownership and Governance of Magticom*

23.    International Telcell has the authority to direct the management of Magticom. On January 15, 2009, ITC Cellular and Dr. Jokhtaberidze executed the Purchase and Sale Agreement ("**PSA**") and the Second Amended and Restated Limited Liability Company Agreement of International Telcell Cellular, LLC (the "**International Telcell LLC Agreement**").

24.    The International Telcell LLC Agreement, provides that Dr. Jokhtaberidze and the Debtors exercise joint management control over International Telcell with all key decisions related to the management of Magticom on a 50/50 basis, provided that no ITC Cellular Change of Control has occurred. As a result, the Debtors' management and employees have been active in the management and operation of Magticom.

25.    The PSA and International Telcell LLC Agreement set forth the terms on which the Debtors will receive distributions from Magticom. Specifically, the International Telcell LLC Agreement provides that International Telcell shall cause Magticom to pay, on a quarterly basis, an annual dividend of not less than US$40,000,000 in the aggregate (net of all withholding taxes) to its shareholders until the date of an initial public offering (the "**Minimum Dividend**"). However, Magticom will only distribute dividends in excess of operating and capital expenditures and tax payments. International Telcell will then distribute all dividends received

to its Members (as defined in the International Telcell LLC Agreement, which include ITC Cellular, Dr. Jokhtaberidze, and Gemstone Management Limited) in accordance with their Membership Interests (as defined in the International Telcell LLC Agreement). Absent an ITC Cellular Change of Control, these provisions entitled the Debtors to approximately $18.4 million per year in distributions, which comprise virtually all of the Debtors' income.

### 3. *International Telcell LLC Agreement Change of Control Provisions*

26.    As part of the International Telcell LLC Agreement, both the Debtors and Dr. Jokhtaberidze are bound by non-alienation and change of control provisions regarding their interests in Magticom. Under the terms of the International Telcell LLC Agreement, these provisions are triggered by the occurrence of any one of eight events (each an "**ITC Cellular Change of Control**") with respect to certain entities in MIG's and ITC Cellular's ownership chain. Specifically, an ITC Cellular Change of Control occurs upon the occurrence of any of the following events:

(a)    Caucuscom ceasing to beneficially own in the aggregate, directly or indirectly at least 46% of the Equity Securities of the Company;

(b)    Caucus Carry ceasing to be the general partner of Caucuscom;

(c)    Yola and Gtel ceasing to hold 100% of limited partner interests in Caucus Carry;

(d)    Caucus Telecom ceasing to be the general partner of Caucus Carry;

(e)    Yola and Gtel ceasing to hold 100% of the Equity Securities of Caucus Telecom;

(f)    Yola and Gtel ceasing to hold at least 35% of the limited partnership interests in Caucuscom Ventures;

(g)    Yola and Gtel (acting jointly through their direct and indirect Subsidiaries) ceasing to direct or cause direction (i) of management and policies of ITC Cellular or (ii) of the exercise and performance of ITC Cellular's rights and obligations under the International Telcell LLC Agreement; and

(h)    any Change of Control of Yola, Gtel, Caucus Telecom, Caucus Carry or Caucuscom.[5]

27.    An ITC Cellular Change of Control has the effect of eliminating, among other things: (i) ITC Cellular's voting rights on the International Telcell board; (ii) the Debtors' right to receive their share of the Minimum Dividend; (iii) the right of MIG to cause and initial public offering (an "**IPO**") of Magticom itself as opposed to a separate MIG vehicle; and (iv) express covenants by Dr. Jokhtaberidze to support MIG in an IPO of Magticom.

**C.    The 2009 Chapter 11 Case.**

28.    On June 18, 2009, MIG commenced the 2009 Chapter 11 Case in this Court in the face of an overwhelming judgment in the total amount of $188,367,736.47 (the "**Judgment**"), granted to former preferred shareholders in the appraisal action captioned *In re: Appraisal of Metromedia International Group, Inc.*, Civil Action No. 3351 (Del. Ch. April, 16, 2009).

29.    The Judgment was substantially higher than MIG had anticipated and, at the time of the Judgment, MIG's management believed that the Judgment was overstated.[6] In light of (a) the size of the Judgment, (b) the breakdown in settlement negotiations with the holders of the Judgment (the "**Judgment Holders**"), (c) the lack of liquidity in the financial markets, (d) the illiquid nature of MIG's primary assets, (e) the death of Badri Patarkashvilli, a Georgian billionaire who had previously expressed a willingness to provide liquidity to MIG, and (f) the impact of the ITC Cellular Change of Control provisions on MIG's ability to address the Judgment, MIG determined to seek chapter 11 protection in order to pursue an appeal of the

---

[5]    Pursuant to the PSA and International Telcell LLC Agreement, "Control" means, in relation to any Person (other than an individual), the possession, directly or indirectly, whether or not in conjunction with any other Person, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of securities or other ownership interests, by contract or otherwise (it being understood that a Person will be deemed to Control another Person if the first Person has the right to elect a majority of the board or equivalent governing body of such second Person); and a "Change of Control" occurs if a Person who Controls any Person (other than an individual) ceases to do so or if another Person acquires Control of it.

[6]    The Delaware Supreme Court affirmed the Chancery Court's decision on November 2, 2009.

Judgment and, if unsuccessful in the appeal, to address the Judgment through the chapter 11 process.

30.    On June 30, 2009, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "**2009 Committee**"), comprised largely of the Judgment Holders.

31.    After a long and often contentious chapter 11 case, MIG and the 2009 Committee ultimately negotiated and agreed to the terms of the Joint Plan, which was confirmed on November 19, 2009 and went effective on December 31, 2010 (the "**Effective Date**").

32.    Under the terms of the Joint Plan, holders of general unsecured claims and claims under MIG's supplemental employee retirement plan were reinstated or received payment in full.

33.    Each Judgment Holder received its pro rata share of (inclusive of principal and interest):

(a) the Notes in the principal amount as of the Effective Date of $219,901,392, which represented the principal amount of the Judgment, plus interest;

(b) warrants in reorganized MIG,

(c) beneficial interests in a litigation trust that was given standing to pursue causes of action to invalidate the ITC Cellular Change of Control Provisions (the "**MIG Litigation Trust**"), and

(d) certain cash that was either held by MIG at the Effective Date or to be distributed from International Telcell (the "**Excess Cash**").

34.    As required by the terms of the Joint Plan, the MIG LLC Agreement provides that the Board shall have no power and authority to, and covenants and agrees not to take any action which would trigger an ITC Cellular Change of Control. In addition, pursuant to the new governance documents for reorganized MIG, the MIG board of managers was increased to include the appointment of two Managers appointed by the Noteholders (the "**Noteholder Managers**"). Pursuant to the Plan documents, the Noteholders selected Julian Bourne and

Enrico DiGirolamo to be the initial Noteholder Managers.    Mr. Bourne and Mr. DiGirolamo have served as the Noteholder Managers since the Effective Date and continue to serve on the Board as well as the sole members of the Strategic Transaction Committee of the Board appointed to oversee the restructuring process.

**D.    The Senior Secured Cash/PIK Notes, Due 2016**

### 1.    *Principal and Interest*

35.    The Notes were issued on the Effective Date of the Joint Plan on December 31, 2010, in the initial principal amount of $219,901,392.  Pursuant to the terms of the Joint Plan and the Indenture, MIG made two required redemptions to pay down principal of $17,921,728 in June 2011 and $2,100,000 in November 2011.

36.    The Notes bear escalating interest payable semi-annually comprised of (a) cash interest on the principal amount of the Notes (inclusive of any previously issued PIK Notes) at a rate of 9% per annum and (b) PIK interest on the principal amount of the Notes (inclusive of any previously issued PIK Notes) by issuing new notes (the "**PIK Notes**") at the following PIK interest rates during the following time periods: 6.5% (December 31, 2010 through December 31, 2013); 8.5% (December 31, 2013 through December 31, 2014); and 11.0% (December 31, 2014 through December 31, 2016) ("**PIK Interest**").  The Indenture permits MIG to elect to not pay the entire installment in Cash Interest under certain circumstances and on limited occasions and instead may issue Additional PIK Notes, as defined and described in the Indenture.  In the event that MIG exercises this option, the PIK Interest Rates are increased by 2% after the issuance of Additional PIK Notes.  MIG exercised this option in June 2013.

37.    The principal amount of the Notes as of June 30, 2014, inclusive of previously issued PIK Notes and Additional PIK Notes (as defined in the Indenture) but exclusive of Cash Interest or PIK Interest due June 30, 2014, was $252.4 million.  Pursuant to the Indenture, on

June 30, 2014, the Debtors became liable for the payment of $11,358,314.33 in Cash Interest and $13,251,366.71 in PIK Interest.

38.    Since December 31, 2010, MIG has paid the following Cash Interest and issued PIK Notes in the amounts of PIK Interest set forth below:

| **Date** | **Cash Interest Paid** | **PIK Interest** |
| --- | --- | --- |
| June 2011 | $9,895,563 | $7,146,795 |
| December 2011 | $9,319,194 | $6,728,389 |
| June 2012 | $9,618,972 | $6,947,036 |
| December 12 | $9,931,588 | $7,172,814 |
| June 2013 | $3,418,122 | $14,242,217[7] |
| December 2013 | $10,895,266 | $10,289,973 |

39.    Based on the rates of Cash Interest and PIK Interest and the escalating principal balance resulting from the issuance of PIK Notes, the following additional interest payments (rounded to the nearest million) become due under the Notes:

| **Date** | **Cash Interest** | **PIK Interest** |
| --- | --- | --- |
| June 2014 | $11 million | $13 million |
| December 2014 | $12 million | $14 million |
| June 2015 | $13 million | $18 million |
| December 15 | $13 million | $19 million |
| June 2016 | $14 million | $21 million |
| December 2016 | $15 million | $22 million |

---

[7]    In June 2013, MIG exercised its option to pay a portion of the required cash interest in Additional PIK Notes

40.     At maturity on December 2016, the principal balance of the Notes would be approximately $360 million, which is approximately $140 million more than the principal amount of the Notes when issued in December 2010.

### 2.      *Security Interest*

41.     Pursuant to the Security Agreement (the "**Security Agreement**"), dated December 31, 2010, entered into by MIG, Caucuscom and ITC Cellular with the Indenture Trustee, to secure the Notes:

      (a)     MIG granted a security interest in all of its assets,

      (b)     Caucuscom granted the Collateral Agent (i) a security interest in all of its limited liability company interests in MIG, (ii) all rights to distributions payable thereon and (iii) all rights to vote such limited liability company interests; and

      (c)     ITC Cellular granted the Collateral Agent a security interest in the Equity Securities (as such term is defined in the International Telcell LLC Agreement) of International Telcell owned by ITC Cellular to the extent of entitling the interest holder the proceeds from any sale of such Equity Securities pursuant to a sale conducted in compliance with the terms to the International Telcell LLC Agreement and not title to such Equity Securities or any rights incidental thereto.

42.     Pursuant to that certain MIG Pledge Agreement, dated December 31, 2010, by MIG in favor of the Collateral Agent (the "**MIG Pledge Agreement**"), MIG granted the Collateral Agent a security interest in all of its limited liability company interests in ITC Cellular, all rights to distributions payable thereon and all rights to vote such limited liability company interests as security of the Note Obligations.

43.     Pursuant to the Caucuscom Pledge Agreement, Caucuscom granted the Collateral Agent a security interest in all of its limited liability company interests in MIG as security for the Note Obligations.

44.     Pursuant to that certain Distribution Pledge Agreement, dated December 31, 2010 (the "**International Telcell Distribution Pledge Agreement**," and together with the MIG Pledge Agreement and the Caucuscom Pledge Agreement, the "**Pledge Agreements**"), ITC Cellular granted the Collateral Agent a security interest in the Equity Securities (as defined in the International Telcell LLC Agreement) of International Telcell owned by ITC Cellular.

45.     Pursuant to that certain Account Control Agreement, dated December 31, 2010 (the "**Notes Account Control Agreement**," and together with the Company Account Control Agreement, the "**Accounts Agreements**"), among MIG, the Collateral Agent and the Company Accounts Bank, MIG granted the Collateral Agent a security interest in the Note Payment Account  (as defined below).  Pursuant to that certain Account Control Agreement, dated December 31, 2010 ("**Company Account Control Agreement**" and together with the Notes Account Control agreement, the "**Account Control Agreements**" ), among MIG, the Collateral Agent and the BONY, as account bank and securities intermediary (the "**Company Accounts Bank**"), MIG granted the Collateral Agent a continuing lien on and security interest in (collectively, the "**Account Collateral**") the Plan Funding Account (as defined below) and the Operating Account (as defined below) (collectively, the "**Company Collateral Accounts**")).

E.     **MIG Litigation Trust and the Change of Control Litigation**

46.     On the Effective Date of the Joint Plan, the MIG Litigation Trust was formed and provided with $750,000 in funding.  Under the Joint Plan, the MIG Litigation Trust was delegated all of the Debtors' rights to bring any claims challenging the validity or enforceability of the ITC Cellular Change of Control provisions on any grounds and under any applicable law. The Joint Plan and MIG Litigation Trust formation documents conferred standing on the MIG Litigation Trust to bring an action related to such claims, if (a) there was an Event of Default or threat of an Event of Default under the Notes or (b) at any time after November 1, 2011,

regardless of the existence or threat of an Event of Default, unless all affected parties delivered to the trustee of the MIG Litigation Trust (the "**Litigation Trustee**") agreements tolling the statute of limitations for commencement of such an action.

47.     From approximately October 2011 until November 2012, MIG, ITC Cellular, the Caucuscom Entities, Yola, Gtel, and Dr. Jokhtaberidze each executed tolling agreements as required by the Litigation Trustee. The final tolling agreement expired on December 31, 2012.

48.     On December 21, 2012, as a result of the impending expiration of the tolling agreements, the MIG Litigation Trust commenced arbitration proceedings on behalf of MIG and ITC Cellular in the London Court of International Arbitration (the "**LCIA**") against Dr. George Jokhtaberidze, seeking declaratory, equitable, statutory, injunctive and other relief for the MIG Litigation Trust in connection with certain provisions contained in the PSA, International Telcell LLC Agreement and related documents and declaring that the ITC Cellular Change of Control provisions were impermissible and invalid.

49.     The status of the LCIA proceeding was kept confidential from the Debtors.

50.     On February 7, 2014, the LCIA dismissed the proceeding upon finding that the MIG Litigation Trust did not have standing to bring claims to invalidate the ITC Cellular Change of Control provisions and awarded costs to Dr. Jokhtaberidze. The Debtors do not believe that the ruling is subject to appeal. As a result of the LCIA determination, the ITC Cellular Change of Control provisions remain valid and applicable to the Debtors' interests in Magticom.

**F.      2012-2013 Restructuring Negotiations**

51.     In October 2012, MIG reached out to some of the largest holders of the Notes to form an ad hoc committee of Noteholders (the "**Ad Hoc Committee**") to explore a potential restructuring.

52.     Pursuant to non-disclosure agreements, MIG and the Ad Hoc Committee began restructuring discussions.   The Ad Hoc Committee was initially comprised of entities with investment authority on more than 75% in the aggregate of the Notes.  On November 15, 2012, MIG held a meeting with members the Ad Hoc Committee to discuss the framework of a restructuring proposal based on a preliminary offer from Shenton Park to purchase MIG's 46% interest in International Telcell.  On November 19, 2012, the Committee responded to the Company that the range suggested by MIG for a buyout of the Notes "is too low to be considered as a starting point for any meaningful discussions."   On December 11, 2012, the individual Noteholders comprising the Ad Hoc Committee instructed the Indenture Trustee not to consent to the proposed transaction.

53.     In January 2013, the Ad Hoc Committee was reconstituted to include a smaller subset of Noteholders, comprised of entities with investment authority on more than 60% in the aggregate face amount of the Notes.  From about January 31, 2013 through February 25, 2013, MIG, the Litigation Trustee, the Ad Hoc Committee and Shenton Park conducted further restructuring negotiations.   Those negotiations ultimately did not result in an acceptable transaction.

## G.   Dr. Jokhtaberidze Asserts Trigger of ITC Cellular Change of Control Provisions

54.     On April 25, 2014, MIG received a notice from counsel to Dr. Jokhtaberidze asserting that as a result of the expiration of the Caucuscom partnership, an ITC Cellular Change of Control had occurred under the PSA and International Telcell LLC Agreement and that such ITC Cellular Change of Control had triggered the loss of MIG's voting, approval, and other rights with respect to Magticom, including their right to receive the Minimum Dividend.

55.     MIG engaged BVI counsel to provide advice to MIG on the impact of the expiration of the Caucuscom partnership on the partnership itself, on its equity in MIG, and on

MIG's rights under the PSA and International Telcell LLC Agreement. On June 10, 2014, MIG's BVI counsel responded to Dr. Jokhtaberidze's counsel advising that while under BVI law Caucuscom terminated on April 15, 2014, such termination did not result in the ITC Cellular Change of Control because Caucuscom's current partners remain in control of Caucuscom.

56. Notwithstanding the position of BVI counsel, as of the date hereof, Dr. Jokhtaberidze has not consented to the release of distributions to MIG which would have been due under the Minimum Dividend provisions. On June 23, 2014, the Debtors received additional correspondence from counsel for Dr. Jokhtaberidze stating that they disagree with the conclusions of MIG's BVI counsel and that an ITC Cellular Change of Control has occurred.

**H. The Debtors' Goals in these Chapter 11 Cases.**

57. Faced with an impending interest payment for which MIG does not have sufficient liquidity, the Debtors determined to file for relief under chapter 11 to encourage a collaborative process to find an acceptable transaction, whether to a third party or through a credit bid exercised by the Indenture Trustee on behalf of the Noteholders. The Debtors are prepared to consider other restructuring transitions as well.

58. In furtherance of these goals, on June 20, 2014, the MIG Board of Managers voted to appoint a special "Strategic Transactions Committee" of the Board to explore a strategic transaction involving MIG, ITC Cellular and/or their indirect and direct, respectively, interests in International Telcell. The Board has delegated the responsibility to oversee this process to the Special Transactions Committee. The Board appointed the two Noteholder Managers, Mr. Bourne and Mr. DiGirolamo as the sole members of the Strategic Transactions Committee. In addition, the Board appointed me as CRO. Neither Mr. Bourne, Mr. DiGirolamo, nor I have any affiliation with any of Sun, Salford, Yola, Gtel, Shenton Park or the Caucuscom entities other

than through our involvement as members of the Board, in the case of Mr. Bourne and Mr. DiGirolamo, and in my case as an employee and officer of the Debtors.

59.     In addition, the Debtors have retained Rothschild, Inc. ("**Rothschild**"), as financial advisor and investment banker to conduct a marketing and sale process for MIG's interest in ITC Cellular or ITC Cellular's interest in International Telcell. The Debtors intend to begin marketing their assets to potential buyers immediately following the commencement of these cases and to file a motion to set procedures for the sale of their assets pursuant to section 363 of the United States Bankruptcy Code. The Debtors believe that a marketing and sale process through section 363 of the United States Bankruptcy Code will yield the maximum value for their assets.

60.     The Debtors believe that a chapter 11 process is the only viable means of addressing its issues concerning its lack of liquidity, its corporate governance issues and its relationship with Dr. Jokhtaberidze.

### III.   MOTIONS

61.     Concurrently with and shortly after the filing of these chapter 11 cases, MIG will be filing a number of Motions.[8] I have reviewed each of the Motions, including the exhibits thereto, and I believe that the relief sought in each of the Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve success in these chapter 11 cases.

---

[8] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant Motions.

A.    **<u>First Day Motions</u>**

1.    *Motion of the Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases*

62.    By this motion (the "**Joint Administration Motion**"), the Debtors request the joint administration of the Debtors' related chapter 11 cases for procedural purposes only. Specifically, the Debtors request that the court maintain one file and one docket for the Debtors' chapter 11 cases and also request that the caption of their chapter 11 cases be modified to reflect the joint administration.    Additionally, the Debtors request that the Court authorize that a combined service list be used for the jointly administered chapter 11 cases and that combined notices be sent to creditors of the Debtors' estates.

63.    ITC Cellular is a wholly owned subsidiary of MIG, such that the Debtors constitute "affiliates" of one another within the meaning of 11 U.S.C. § 101(2).[9]    Joint administration of these chapter 11 cases (a) is warranted because the Debtors' financial affairs and business operations are closely related, and (b) will avoid the unnecessary administrative burden on the Court and parties-in-interest in these chapter 11 cases. Specifically, joint administration will permit the Office of the Clerk of this Court (the "**Clerk**") to use a single general docket for the Debtors' chapter 11 cases and to combine notices to creditors and other parties-in-interest of the Debtors' respective estates.    Joint administration also will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in each of the chapter 11 cases.  Further, if the Court approves joint administration of the Debtors' cases, the Debtors will be able to reduce fees and costs resulting from the administration of these chapter 11 cases

---

[9] Section 101(2) of the Bankruptcy Code defines "affiliate" to include, in relevant part, a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . ." 11 U.S.C. § 101(2).

and ease the onerous administrative burden of having to file multiple documents.

64.     For these reasons and those set forth in the Joint Administration Motion, the Debtors respectfully request that this Court grant the relief sought in the Joint Administration Motion.

2.      ***Motion of the Debtor for Order Authorizing the (A) Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks and (B) Continued Use of Existing Cash Management System***

65.     By this motion (the "**Cash Management Motion**"), the Debtors seek entry of an order: (a) authorizing them to maintain their five existing bank accounts (the "**Bank Accounts**") and their existing cash management system (the "**Cash Management System**"); (b) waiving certain provisions of the deposit guidelines of the Office of the United States Trustee (the "**Guidelines**"); and (c) providing any additional relief as is necessary to effectuate the foregoing. Specifically, the Debtors request authority to continue to maintain the Bank Accounts and Cash Management System in the form and manner in existence prior to the Petition Date, including funding their day to day operations out of the Operating Support Account (as that term is defined in the Cash Management Motion). To that end, the Debtors request (1) that they not be required to close their accounts and open new accounts and (2) that they not be required to maintain a separate account for taxes, as is required by the Guidelines.

66.     The Bank Accounts were created after the conclusion of the 2009 Chapter 11 Case and pursuant to the terms of the Indenture, as set forth on **Exhibit A** to the Cash Management Motion. Three of the accounts – the Note Payment Account, the Plan Funding Account, and the Operating Account – are collateral accounts maintained at BONY pursuant to the Indenture and Account Control Agreements. The remaining two accounts – the Operating Support Account and the Workers' Compensation Account – are maintained at Wells Fargo, are

not subject to any account control agreement and are used to fund the Debtors' day to day operations. Each of BONY and Wells Fargo are authorized depositories with the United States Trustee for the District of Delaware.

67.    The Cash Management System is managed as depicted on the account flow chart attached to the Cash Management Motion as **Exhibit B** and as follows (the "**Cash Management System**"):

a.    **The Note Payment Account** – Pursuant to the Indenture and the Account Control Agreements, MIG is required to deposit all receipts, cash flow and excess reserves from the Plan Funding Account into the Note Payments Account. Prior to the Petition Date, disbursements were made from the Note Payments Account to fund (i) distributions on the Notes, (ii) transfers to the Operating Account to fund the Operating Budget (as described below), and (iii) other matters permitted under the Indenture. The disbursements from the Note Payments Account were made through written direction to BONY as Note Accounts Bank.

The balance in the Note Payment Account as of June 30, 2014, is approximately $865,000.

b.    **The Plan Funding Account** – The Plan Funding Account was established to fund an account maintained by the disbursing agent under Joint Plan, as well as a reserve for certain potential tax liability resulting from the conversion of MIG from a corporation to an LLC (the "**Tax Reserve**"). As of the Petition Date, the Plan Funding Account exists solely to hold the Tax Reserve. Distributions from the Plan Funding Account may only be made by written request to BONY to fund the tax for which the Tax Reserve was established.

The balance in the Plan Funding Account as of June 30, 2014, is approximately $4 million. Use of the $4 million for payments on the Notes or for operations is restricted until after September 30, 2014.

c.    **The Operating Account** – Pursuant to the Plan and the Indenture, MIG's day-to-day business operations were required to be conducted in accordance with the an annual operating budget (the "**Operating Budget**"). The Operating Account is funded annually from the Note Payment Account in an amount up to the total Operating Budget applicable to the next succeeding year.

The balance in the Operating Account as of June 30, 2014, is approximately $3.3 million.

d. **The Operating Support Account** – The Operating Support Account is used by MIG to fund its day to day operations, including payments to be made out of the Workers' Compensation Account. Under the Indenture and Account Control Agreements, MIG was authorized to direct BONY to transfer funds from the Operating Account into the Operating Support Account, subject to certain restrictions, to fund the operations.

The balance in the Operating Support Account as of June 30, 2014, is approximately $1.3 million.

e. **The Workers' Compensation Account** – The Workers' Compensation Account is a zero balance account that pulls from the Operating Support Account to fund MIG's workers' compensation liabilities. As of the Petition Date, MIG has notified Wells Fargo to stop drawing from the Operating Support Account and to stop making payments on account of MIG's pre-Petition workers' compensation liabilities.

The balance in the Workers' Compensation Account as of June 30, 2014, is $0.

68.     The Debtors do not believe that allowing them to maintain the Bank Accounts and utilize them pursuant to the existing Cash Management System described above will prejudice any party-in-interest or their estates. Further, the Debtors' Cash Management System constitutes a customary and essential business practice that was created and implemented in manner consistent with the Indentures by the Debtors' management in the exercise of their business judgment and should be continued during the pendency of these cases.

69.     For these reasons and those set forth in the Cash Management Motion, the Debtors respectfully request that this Court grant the relief sought in the Cash Management Motion.

**3.**          *Debtors' Application for Entry of an Order Authorizing the Retention and Appointment of Prime Clerk LLC as Claims and Noticing Agent, Nunc Pro Tunc to the Petition Date*

70.      By this application (the "**Prime Clerk 156(c) Application**") the Debtors propose to retain and appoint Prime Clerk LLC ("**Prime Clerk**") as claims and noticing agent (the "**Claims and Noticing Agent**") in the Debtors' chapter 11 cases, *nunc pro tunc* to the Petition Date.

71.      Prime Clerk is comprised of leading industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases. Prime Clerk's professionals have experience in noticing, claims administration, solicitation, balloting and facilitating other administrative aspects of chapter 11 cases and experience in matters of this size and complexity. Prime Clerk's professionals have acted as debtor's counsel's or official claims and noticing agent in many bankruptcy cases in this District and in other districts nationwide.

72.      The Debtors anticipate that there will be in excess of 300 entities to be noticed in these chapter 11 cases.   In view of the number of anticipated parties in interest, the Debtors submit that the appointment of Prime Clerk as the Claims and Noticing Agent is both necessary and in the best interests of the Debtors' estates, creditors and other parties in interest because the Debtors and the office of the clerk of the Court will be relieved of the burdens associated with the claims and noticing services.

73.      For all of these reasons and those set forth in the Prime Clerk 156(c) Application, the Debtors respectfully request that this Court grant the relief sought in the Prime Clerk 156(c) Application.

**B.**    **Second Day Motions and Applications**

1.    *Debtors' Application for an Order Authorizing Retention and Employment of Prime Clerk LLC as Administrative Advisor, Nunc Pro Tunc to the Petition Date*

74.    By this application (the "**Prime Clerk 327 Application**") the Debtors propose to retain and appoint Prime Clerk as administrative advisor (the "**Administrative Advisor**") in the Debtors' chapter 11 cases, *nunc pro tunc* to the Petition Date.

75.    As discussed previously, the Debtors have also filed the Prime Clerk 156(c) Application, seeking entry of an order appointing Prime Clerk as claims and noticing agent. The Debtors believe that administration of these chapter 11 cases may require Prime Clerk to perform duties outside the scope requested in the Prime Clerk 156(c) Application. Therefore, to enable Prime Clerk to provide services outside the scope of the Prime Clerk 156(c) Application, the Debtors submit this Prime Clerk 327 Application for an order authorizing the Debtors to employ and retain Prime Clerk as Administrative Advisor for the Debtors. The Debtors believe this relief is necessary to help manage administrative tasks with respect to the hundreds of parties in interest that may be involved in the Debtors' chapter 11 cases.

76.    For all of these reasons and those set forth in the Prime Clerk 327 Application, the Debtors respectfully request that this Court grant the relief sought in the Prime Clerk 327 Application.

2.    *Debtors' Application for Order Authorizing the Employment and Retention of Greenberg Traurig, LLP as Counsel for the Debtors and Debtors in Possession, Nunc Pro Tunc to the Petition Date*

77.    By this application (the "**GT Retention Application**") the Debtors propose to engage Greenberg Traurig, LLP ("**Greenberg Traurig**") as counsel for the Debtors in these chapter 11 cases.

78.     The Debtors seek to retain Greenberg Traurig in these cases because of the firm's extensive general experience and knowledge in the field of debtor's and creditor's rights and business reorganizations under Chapter 11 of the Bankruptcy Code as well as Greenberg Traurig's experience in representing the Debtors since 2009. Greenberg Traurig is well suited for the type of representation required by the Debtor, given the firm's substantial experience representing debtors in complex reorganization Cases. In addition to bankruptcy and workouts, members of the firm practice in almost all other practice areas, including litigation, business, international trade, employment, tax, labor, corporate, and commercial law. Greenberg Traurig is an international law firm with more than 1,700 attorneys in 29 offices, including an office for the practice of law in Wilmington, Delaware, where these chapter 11 cases are pending. Greenberg Traurig has extensive experience appearing before the courts in this district. Accordingly, the Debtors determined that Greenberg Traurig has the resources and experience necessary to represent them in these chapter 11 cases.

79.     For all of these reasons and those set forth in the GT Retention Application, the Debtors respectfully request that this Court grant the relief sought in the GT Retention Application.

    **3.**       ***Debtors' Application for Entry of an Order Authorizing the Retention of Natalia Alexeeva as Chief Restructuring Officer for the Debtors and Debtors in Possession, Nunc Pro Tunc to the Petition Date***

80.     By this application (the "**CRO Retention Application**"), the Debtors request entry of an order authorizing my retention as CRO *nunc pro tunc* as of the Petition Date.

81.     I am an experienced professional with over twenty years of experience working as an attorney and in various management positions. Prior to joining the Debtors, I was an associate at the law firm of Clifford Chance from 1992 through 1994, and an associate at the law

firm of Patterson, Belknap, Webb & Tyler LLP from 1995 through 2001. I have a Juris Doctor degree from Moscow State University and a Master of Laws degree from Columbia University School of Law.

82.    I have been asked to serve as the CRO to assist the Debtors with their reorganization efforts and their chapter 11 cases, as further described in the CRO Application. I am qualified to serve as the CRO given my intimate familiarity with the Debtors' business, financial affairs and capital structure. I have worked closely with the Debtors' management and other professionals for several years.

83.    Accordingly and for the reasons set forth in the CRO Retention Application, the Debtors respectfully request that this Court grant the relief sought in the CRO Retention Application.

4.    ***Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Rothschild Inc. as Financial Advisor and Investment Banker for the Debtors and Debtors in Possession, Nunc Pro Tunc to the Petition Date and Waiving Certain informational Requirements of Local Rule 2016-2***

84.    By this application (the "**Rothschild Retention Application**") the Debtors request authority to engage Rothschild Inc. ("**Rothschild**") as their financial advisor and investment banker in these chapter 11 cases.

85.    The Debtors seek to retain Rothschild as their financial advisor and investment banker because, among other things, Rothschild has extensive experience and an excellent reputation in providing high quality investment banking services to debtors and creditors in bankruptcy reorganizations and other restructurings. In addition, Rothschild has a detailed understanding of the Debtors' business from its involvement as financial advisor to the 2009 Committee in the 2009 Chapter 11 Case, and from advising the Debtors since March 2013 on potential restructuring options.

86.     In addition, Rothschild is a member of one of the world's leading independent investment banking groups, with more than forty offices in more than thirty countries. As a leading global firm, Rothschild has a strong practice that covers the CIS based out of Moscow. Rothschild has expertise in domestic and cross-border restructurings, mergers and acquisitions, new capital raises and other financial advisory and investment banking services, and particular experience in providing high-quality financial advice to financially troubled companies. Rothschild is an experienced bankruptcy and restructuring advisor to debtors, bondholders, creditors' committees, single creditor classes and secured creditors in a variety of industries. Rothschild is highly qualified to advise on strategic alternatives and its professionals have extensive experience in deals involving complex financial and operating restructurings. Moreover, Rothschild is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

87.     For all of these reasons and those set forth in the Rothschild Retention Application, the Debtors respectfully request that this Court grant the relief sought in the Rothschild Retention Application.

5.      ***Application of Debtors and Debtor-in-Possession for Order Authorizing the Retention and Employment of Cousins Chipman and Brown, LLP as Conflict Counsel for the Debtors, Nunc Pro Tunc to the Petition Date***

88.     By this application (the "**CCB Retention Application**"), the Debtors request entry of an order authorizing them to employ and retain Cousins Chipman and Brown, LLP ("**CCB**") as conflicts counsel in these chapter 11 cases, effective as of the Petition Date, to represent them in matters that the Debtors' lead bankruptcy counsel, Greenberg, may be unable to handle due to conflicts of interest. CCB is a full service law firm with its principal office in Wilmington, Delaware. Because of CCB's extensive experience and knowledge in the fields of

business ligation and bankruptcy.   In addition, attorneys of CCB have experience with the Debtors having represented parties in the 2009 Chapter 11 Case as more fully set forth in the CCB Retention Application.   CCB is well-suited for the type of representation that the Debtors require.   The Debtors seek to retain CCB at this time so that if a matter arises for which Greenberg has a conflict, CCB will be immediately available to handle the matter.   Greenberg and CCB will carefully coordinate their efforts and clearly delineate their duties to prevent any duplication of efforts.

89.    For these reasons and those set forth in the CCB Retention Application, the Debtors respectfully request that this Court grant the relief sought in the CCB Retention Application.

6.        ***Motion of the Debtor for Administrative Order Under Sections 105(a) and 331 Establishing Procedures or Interim Monthly Compensation and Reimbursement of Expenses of Professionals***

90.    By this motion (the "**Interim Compensation Procedures Motion**"), the Debtors seek entry of an order establishing procedures for the payment of fees and reimbursement of expenses for professionals retained pursuant to Court Order.

91.    The Debtors have filed or will file applications to retain: (a) Greenberg Traurig as its general bankruptcy counsel, (b) Cousins Chipman and Brown LLC as conflict counsel, and (c) Rothschild as financial advisor and investment banker.   The Debtors further anticipate that they may also retain other professionals in these chapter 11 cases if the need arises.   Moreover, any statutory committee appointed in these chapter 11 cases (each, a "**Committee**") will likely retain counsel and other professionals to represent them in connection with these chapter 11 cases (together with the Debtor's Professionals, the "**Professionals**").   The involvement of additional Professionals may cause the professional fee application and review process to be exceptionally burdensome on the Debtors, the Professionals, the Office of the United States

Trustee and this Court. Implementation of compensation procedures will provide an efficient structure for disbursing compensation to the Professionals and will allow all parties in these chapter 11 cases to monitor the monthly accrual of compensation for each Professional.

92.     For these reasons and those set forth in the Interim Compensation Procedures Motion, the Debtors respectfully request that this Court grant the relief sought in the Interim Compensation Procedures Motion.

## IV.    CONCLUSION

93.     For the reasons described herein and in the Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Bankruptcy Court grants the relief requested in each of the Motions and respectfully request the Bankruptcy Court to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 30 , 2014

_____

NATALIA ALEXEEVA
Chief Restructuring Officer