IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| MIG, LLC, et al.,[1] | ) ) ) | Case No. 14-11605 (KG) |
| | ) ) | (Jointly Administered) |
| Debtors. | ) ) | |

## MOTION OF INDENTURE TRUSTEE FOR AN ORDER, PURSUANT TO FED. R. BANKR. P. 2004 AND LOCAL RULE 2004-1, AUTHORIZING DISCOVERY FROM SHENTON PARK COMPANY INC.

The Bank of New York Mellon (the "**Indenture Trustee**" or "**BNYM**"), as Indenture Trustee under that certain indenture among MIG, LLC as Issuer, ITC Cellular LLC as co-obligor, and BNYM, as Trustee, Collateral Agent, Registrar, Paying Agent, and Note Accounts Bank, dated December 31, 2010 (the "**Indenture**"), pursuant to section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United State Bankruptcy Court for the District of Delaware (the "**Local Rules**"), hereby moves this Court for the entry of an order authorizing and directing discovery from Shenton Park Company Inc. ("**Shenton Park**") related to an attempt to liquidate Caucuscom Ventures L.P. ("**Caucuscom**"). This conduct appears designed to artificially depress the value of assets of the estate. In support of this motion, the Indenture Trustee respectfully represents as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: MIG, LLC (5301); and ITC Cellular, LLC (4611).

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code, Rule 2004 of the Bankruptcy Rules and Local Rule 2004-1.

## PRELIMINARY STATEMENT

3. Shenton Park is the majority limited partner in Caucuscom, a British Virgin Islands limited partnership, and the Debtors' equity holder and ultimate parent.[2] The Debtors own an interest in Magticom, the leading mobile telephony operator in Georgia and the Debtor's only material asset. In June 2015, without any notice to the Debtors, its creditors, or the Court, Shenton Park initiated dissolution proceedings in the British Virgin Islands for Caucuscom Ventures L.P. The dissolution of Caucuscom could have the effect of triggering a change of control that would *inter alia* (i) terminate the Debtors' voting rights as equity holders of Magticom, (ii) prevent the Debtors from causing an IPO of Magticom, and (iii) impair the Debtors' ability to realize value and pay creditors.[3]

4. There is no legitimate commercial reason for Shenton Park to attempt to trigger a change in control. As one of the ultimate equity holders, Shenton Park should have an interest in preserving the value of the Debtors. But a change in control could only serve to destroy value, leaving Debtors' creditors to wonder what else is going on here. In fact, as

---

[2] Shenton Park has already appeared in these cases. *See Shenton Park Company, Inc.'s Limited Statement to Debtors' Second Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) Extending the Exclusive Periods During Which Only the Debtors May File a Chapter Plan and Solicit Acceptances Thereof* (Docket No. 328).

[3] Nothing in the Motion shall be considered an admission by the Indenture Trustee or any other party that Change of Control has already occurred. No Change of Control has occurred, and any action that might effectuate such a result would be a violation of the automatic stay pursuant to section 362 of the Bankruptcy Code.

5

limited partner of Caucuscom, which pledged its equity in the Debtor MIG, LLC to BNYM as collateral, a liquidation results in no economic return for Shenton Park.

5. The *only* logical explanation for Shenton Park's conduct is that it hopes to destroy the value of the Debtors' debt obligation in order to position itself as the sole party interested in purchasing the Debtors' equity stake in Magticom. In this way, Shenton Park hopes that it can "cash in" on some of that value destruction and secure a "back door" recovery for its equity position. Indeed, Shenton Park has already admitted on the record before the Court that it wants to purchase the Debtors' assets, (See Docket 328; ¶ 11), and even though BNYM firmly believes that a liquidation would not trigger a change of control, Shenton Park and Dr. George Jokhtaberidze have already, or will certainly in the future, take a contrary position.

6. Efforts to secure informal discovery have failed. The Indenture Trustee is now asking this Court to step in and allow the Indenture Trustee to conduct discovery. Without this discovery, the Indenture Trustee, the Debtors, and the creditors could see the value of their interest in the Debtors materially impaired for no commercial reason. And the Debtors will permanently lose bargained for contractual rights because of the disloyal conduct of one of their indirect equity holders.

## RELIEF REQUESTED

7. The Indenture Trustee seeks entry of an order, substantially in the form attached hereto as Exhibit A, directing Shenton Park pursuant to Rule 2004, to provide discovery to the Indenture Trustee regarding certain possible claims by the estate including breach of the implied covenant of good faith and fair dealing and equitable subordination and violation of the automatic stay. Specifically, the proposed order directs Shenton Park to produce the documents set forth on Schedule 1 attached to Exhibit A and to appear for oral examination on

6

topics concerning such documents as reasonably requested by the Indenture Trustee. The Proposed Order also requires Shenton Park to respond to all other reasonable discovery requests that the Indenture Trustee may issue.

## FACTUAL BACKGROUND

A.  **The Debtors' Corporate History, Structure and Assets.**

8.  On June 30, 2014 (the "**Petition Date**"), the Debtors commenced cases ("**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The Debtors continue to manage their properties and operate their businesses as debtors-in-possession in accordance with §§ 1107 and 1108 of the Bankruptcy Code.

9.  No trustee or examiner has been appointed in either of the Chapter 11 Cases. On July 21, 2014, the United States Trustee appointed an official committee of unsecured creditors (the "**Unsecured Creditors Committee**").

10. The Debtors are holding companies. Debtor MIG, LLC ("**MIG**") is a limited liability company organized under the laws of the State of Delaware. As of the Petition Date, MIG's sole valuable asset, beyond its existing cash, is its indirect equity interest in Magticom. Headquartered in Tbilisi, Georgia, Magticom is the leading mobile telephony operator in Georgia, and is also the largest telephone operator (mobile or fixed) in Georgia, as measured by revenues and traffic volumes. It provides services to businesses and consumers nationwide.

11. All of the membership interests in MIG are owned by Caucuscom, which was formed in 2007 to pursue a transaction with MIG. The Limited Partners of Caucuscom include (i) Yola Investments S.a.r.l. ("**Yola**"), a Luxembourg investment group formed and controlled by the UK private equity group Sun Capital Partners Ltd. ("**Sun**"); (ii) Gtel L.P. ("**Gtel**"), a BVI limited partnership formed and controlled by Salford Capital Partners, Inc. ("**Salford**"), its

7

general partner of Gtel; and (iii) Shenton Park, a BVI company formed by the late Georgian billionaire Badri Patarkashvilli, and is now purportedly controlled by an independent investment advisor called Swiss Partners Advisors Ltd. for the benefit of his estate (together with Yola and Gtel, the "**Caucuscom Limited Partners**"). Caucus Carry Management LP ("**Caucus Carry**") is the general partner of Caucuscom.

12. MIG has debt in the form of certain Senior Secured Cash/PIK Notes Due 2016 (the "**Notes**") it issued for the benefit of certain holders (the "**Noteholders**"). The principal amount of the Notes as of June 30, 2014, was $252.4 million.

13. MIG owns 100% of the membership interests in Debtor ITC Cellular, LLC ("**ITC Cellular**"), a Delaware limited liability company. ITC Cellular in turn owns 46% of the membership interests of non-debtor International Telcell Cellular, LLC ("**International Telcell**"). International Telcell, directly and indirectly through its wholly owned non-debtor subsidiary Telcell Wireless, LLC, owns all the issued and outstanding equity interests of non-debtor Magticom Ltd. ("**Magticom**"), the leading mobile telephony company in the Republic of Georgia ("**Georgia**"). The remaining ownership stake of International Telcell is held 51% by Dr. George Jokhtaberidze ("**Dr. Jokhtaberidze**"), a Georgian national who founded Magticom and 3% by Gemstone Management Ltd., an entity formed by certain former management of Magticom. Dr. Jokhtaberidze is also the CEO of Magticom and a Board Member of ITC Cellular.[4]

---

[4] A detailed factual background of the Debtors' business and operations, as well as the events precipitating the commencement of these Chapter 11 Cases, is more fully set forth in the *Declaration of Natalia Alexeeva in Support of the Debtors' Petitions and First-Day Relief* (the "First Day Declaration"), incorporated herein by reference.

**B.    Purchase and Sale Agreement and International Telcell Cellular**

14.    On January 15, 2009, ITC Cellular and Dr. Jokhtaberidze executed the Purchase and Sale Agreement ("**PSA**") and the Second Amended and Restated Limited Liability Company Agreement of International Telcell Cellular, LLC (the "**International Telcell LLC Agreement**").

15.    The International Telcell LLC Agreement, provides that Dr. Jokhtaberidze and the Debtors exercise joint management control over International Telcell with all key decisions related to the management of Magticom on a 50/50 basis, provided that no ITC Cellular Change of Control has occurred.

**1.    Dividend Payments**

16.    The International Telcell LLC Agreement provides that International Telcell shall cause Magticom to pay, on a quarterly basis, an annual dividend of not less than $40 million in the aggregate (net of all withholding taxes) to its shareholders until the date of an initial public offering (the "**Minimum Dividend**"). Such dividend payments are the only source of liquidity for the Debtors.

**2.    International Telcell LLC Agreement Change of Control Provisions**

17.    As part of the International Telcell LLC Agreement, both the Debtors and Dr. Jokhtaberidze are bound by non-alienation and change of control provisions regarding their interests in Magticom, as specifically enumerated in the PSA and International Telcell LLC Agreement. These provisions, as they relate to the Debtors, are triggered by the occurrence of certain events with respect to certain entities in MIG's and ITC Cellular's ownership chain (each an "**ITC Cellular Change of Control**"). Specifically, an ITC Cellular Change of Control occurs upon the occurrence of all of the following events:

9

(a) Caucuscom ceasing to beneficially own in the aggregate, directly or indirectly at least 46% of the Equity Securities of the Company;

(b) Caucus Carry ceasing to be the general partner of Caucuscom;

(c) Yola and Gtel ceasing to hold 100% of limited partner interests in Caucus Carry;

(d) Caucus Telecom ceasing to be the general partner of Caucus Carry;

(e) Yola and Gtel ceasing to hold 100% of the Equity Securities of Caucus Telecom;

(f) Yola and Gtel ceasing to hold at least 35% of the limited partnership interests in Caucuscom Ventures;

(g) Yola and Gtel (acting jointly through their direct and indirect Subsidiaries) ceasing to direct or cause direction (i) of management and policies of ITC Cellular or (ii) of the exercise and performance of ITC Cellular's rights and obligations under the International Telcell LLC Agreement; **and**

(h) any Change of Control of Yola, Gtel, Caucus Telecom, Caucus Carry or Caucuscom.

International Telcell LLC Agreement at ¶ 8.1; PSA at Article 1.

18. Pursuant to the International Telcell LLC Agreement, after an ITC Cellular Change of Control, debtor ITC Cellular's voting rights on the International Telcell board are eliminated. In addition, pursuant to the PSA, Dr. Jokhtaberidze is no longer contractually bound to support ITC Cellular's right to cause the initial public offering (an "**IPO**") of Magticom and is relieved of the risk of a clawback action in the event of his breach of certain provisions of the PSA and International Telcell LLC Agreement.[5]

---

[5] Pursuant to the PSA, if Dr. Jokhtaberidze (a) causes Magticom to take an action that requires board approval without first obtaining board approval, (b) causes Magticom not to take an action that the board has directed Magticom to take, or (c) fails to comply with his obligations with respect to the IPO Covenants or Dividend requirements, then ITC Cellular may send Dr. Jokhtaberidze a clawback breach notice (the "Breach Notice") pursuant to which Dr. Jokhtaberidze must remedy such breach within 30 days of receipt of the Breach Notice or ITC Cellular may commence arbitration. If ITC Cellular succeeds in such arbitration, then ownership of International Telcell LLC is reallocated such that ITC Cellular becomes the majority member while Dr. Jokhtaberidze becomes a minority member. PSA at Article VIII, Section 8.5.

19. The Debtors' ability to share in the governance of Magticom, cause an IPO of Magticom and seek a clawback remedy are critical to the Debtors' reorganization efforts. As a result, an ITC Cellular Change of Control may have severe consequences for the Debtors. The value of the equity interests comprising the Debtors' key assets – their direct and indirect ownership of International Telcell and Magticom – may be substantially and irrevocably diminished.

20. As part of the International Telcell LLC Agreement, both the Debtors and Dr. Jokhtaberidze are bound by non-alienation and change of control provisions regarding their interests in Magticom.

**C.    The 2009 Chapter 11 Case**

21. On June 5, 2009, the Delaware Court of Chancery entered a $188.4 million judgment against MIG in favor of former preferred shareholders related to a Top-Up option, concluding that preferred shares were purchased at too steep a discount in August 2007 (the "**Judgment**") in an appraisal action captioned *In re. Appraisal of Metromedia International Group, Inc.*, Civil Action No. 3351 (Del. Ch. April, 16, 2009).

22. In the face of the Judgment, on June 18, 2009, MIG commenced a Chapter 11 case captioned *In re MIG, Inc.*, Case No. 09-12118 (KG) (Bankr. D. Del) (the "**2009 Chapter 11 Case**").

23. On November 19, 2010, the Court confirmed the *Modified Joint Second Amended Plan of Reorganization for MIG* (the "**Joint Plan**") [Case No. 09-12118 ECF No. 1209]. The effective date of the Plan occurred on December 31, 2010. Pursuant to the Joint Plan, MIG was converted to a Delaware limited liability company. The 2009 Chapter 11 Case was closed on July 27, 2011 [Case No. 09-12118 ECF No. 1501].

11

24. Under the Joint Plan, MIG issued its Notes for the benefit of the Noteholders, pursuant to the Indenture. The Notes are secured by, among other things, cash held in certain collateral accounts and pledges of the equity interests in MIG, MIG's equity interests in ITC Cellular, and ITC Cellular's rights to distributions from International Telcell.

25. Pursuant to the Indenture, certain Security Agreement among the Debtors, Caucuscom Ventures L.P., and BNYM, dated December 30, 2010 (the "**Security Agreement**"), and certain Account Control Agreement between the Indenture Trustee and MIG, dated December 31, 2010 (the "**Control Agreement**"), and various pledge agreements among Caucuscom Ventures L.P., BNYM, and the Debtors, the Notes are secured by, among other things, (i) cash held in certain collateral accounts, and (ii) pledges of (a) the equity interests in MIG (the "**Caucuscom Pledge**"), (b) MIG's equity interests in ITC Cellular, and (c) certain of ITC Cellular's rights with regard to International Telcell. (See Declaration of Natalia Alexeeva (Docket No. 4) ¶¶ 41-45).

26. As required by the terms of the Joint Plan, the MIG LLC Agreement provides that the management of MIG, LLC shall have no power and authority to, and covenants and agrees not to take any action which would trigger an ITC Cellular Change of Control.

27. In order to safeguard against a Change of Control, acknowledgement agreements were signed, in which the signees covenanted not to take any action which would trigger an ITC Cellular Change of Control (the "**Acknowledgement Agreements**"). The signees of the acknowledgement agreements included: certain affiliates of MIG, LLC, including Caucuscom and Caucus Carry; affiliates of Sun Capital, including Yola and individual representatives of Sun Capital in their personal capacities, affiliates of Salford, including Gtel and individual representatives of Salford and Gtel in their personal capacities;

and advisors to Shenton Park in their personal capacities. Certain of the signees of acknowledgement agreements are or were members of the board of directors of International TelCell and Debtor MIG.

### D. The Debtors' Goals in these Chapter 11 Cases.

28. The Debtors' capital structure is highly-leveraged. The principal amount of the Notes as of June 30, 2014, was $252.4 million. In addition, on June 30, 2014, the Debtors became liable for the payment of over $11 million in cash interest and $13 million in payment-in-kind interest payable through the issuance of additional Notes. The Debtors did not have sufficient liquidity to make the June 30 cash interest payment because the Debtors did not receive distributions from Magticom due to a dispute with Dr. Jokhtaberidze over whether such distributions are required to be made.

29. The Debtors filed for relief under chapter 11 and are looking to find an acceptable transaction, whether to a third party or through a credit bid exercised by the Indenture Trustee on behalf of the Noteholders.

### E. Shenton Park's Actions Prior to and since the Petition Date

30. Pursuant to its formation documents, the Caucuscom partnership was set to expire on August 15, 2013. Under the terms of the Caucuscom partnership agreement, the consent of each of the Limited Partners – Yola, Gtel, and Shenton Park – was required to extend the partnership. Through a series of amendments, the limited partners in Caucuscom unanimously elected to extend the termination of Caucuscom until April 15, 2014. On April 24, 2014, Shenton Park informed MIG that it had not agreed to extend the Caucuscom partnership past its April 15, 2014 expiration. Although the term of the Caucuscom partnership has terminated, Caucuscom continues to exist to continue to administer its unfinished business – i.e., its ownership interest in MIG – and to wind up until liquidated by

13

its general partner or order of a BVI court. Given that its MIG membership interests are Caucuscom's only material asset, the resolution of these Chapter 11 Cases is necessary for the effective winding up of Caucuscom.

31. In October 2014 and March 2015, Shenton Park made offers to purchase the Noteholders' debt against the Debtors for a fraction of the face amount of the Notes. Indeed, Shenton Park announced its offer to purchase the Debtors' assets when it appeared before the Court with respect to a motion to extend exclusivity. (Docket No. 328; ¶12).

32. In June 2015, nearly a month after it appeared before the Court and announced its interest in purchasing the Debtors' assets, Shenton Park commenced dissolution proceedings for Caucuscom in the High Court of the British Virgin Islands. No notice of this proceeding was given to the Debtors, BNYM, or the Noteholders. In fact, the petition was only discovered as a result of BNYM's local counsel performing regular checks of the court registry in the British Virgin Islands. A hearing has been scheduled on the matter for September 16, 2015.

33. Economically, as a limited partner Shenton Park has no interest in a dissolution of Caucuscom because all of the value (i.e., the Debtors' equity) would be turned over to BNYM on account of the Caucuscom Pledge of MIG's equity to BNYM on account of the Notes. However, this dissolution proceeding could have the effect of triggering (or at minimum, providing Shenton Park and any other potential party with an argument of the occurrence of) an ITC Cellular Change of Control, thus removing control rights put in place for the benefit of the Debtors as a part of the 2009 Chapter 11 Case, and placing those rights in the hands of Dr. Jokhtaberidze and negatively affecting the value of the Debtors' *only* material asset. BNYM firmly believes that because the ITC Change of Control provision is written in

the conjunctive, the liquidation of Caucuscom will not, by itself, result in an ITC Change of Control. However, Shenton Park and Dr. Jokhtaberidze have in the past, and will certainly continue to do so in the future, taken a contrary position.

34.    There is no commercial reason for this action other than to impair the Debtors' ability to realize value and pay their creditors. We are concerned that Shenton Park has entered into an improper agreement with other stakeholders in the Debtors and agreed to take such an action for the benefit of those stakeholders in violation of their contractual and other legal obligations.

## BASIS FOR RELIEF REQUESTED

35.    The Indenture Trustee is a party in interest under section 1109(b) of the Bankruptcy Code that is authorized to obtain the relief sought herein pursuant to Bankruptcy Rule 2004. Bankruptcy Rule 2004 provides, in relevant part:

>    (a) _Examination on Motion_. On motion of any party in interest, the court may order the examination of any entity.
>
>    (b) _Scope of Examination_. The examination of an entity under this rule or of the debtor under § 343 of the Code may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge.
>
>    (c) _Compelling Attendance and Production of Documentary Evidence_. The attendance of an entity for examination and for the production of documents, whether the examination is to be conducted within or without the district in which the case is pending, may be compelled as provided in Rule 9016 for the attendance of a witness at a hearing or trial.

36.    Rule 2004 provides for very broad discovery that reaches, in a chapter 11 case, any matter relevant to the case or to the formulation of a plan. It is "'the basic discovery device used in bankruptcy cases,' permitting the examination of any party without the requirement of a pending adversary proceeding or contested matter." _In re Symington_, 209

15

B.R. 678, 683 (Bankr. D. Md. 1997) (quoting *In re French*, 145 B.R. 991, 992 (Bankr. D.S.D. 1992)). Moreover, Bankruptcy Rule 2004 examinations are "unfettered and broad" in scope. *In re Washington Mut., Inc.*, 408 B.R. 45, 49 (Bankr. D. Del. 2009). "A Rule 2004 examination permits a broad range of inquiry into all matters relevant to the debtor's financial affairs." *In re Arkin-Medo, Inc.*, 44 B.R. 138, 140 (Bankr. S.D.N.Y. 1984).

37. Indeed, "[t]he scope of a [Rule] 2004 examination is even broader than that of discovery permitted under the [Federal Rules of Civil Procedure], which themselves contemplate broad, easy access to discovery." *In re Valley Forge*, 109 B.R. 669, 674 (Bankr. E.D. Pa 1990). The investigative power embodied in Rule 2004 is "is commonly recognized as more in the nature of a 'fishing expedition.'" *Washington Mut., Inc.*, 408 B.R. at 50 (quoting *In re Bennett Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996)).

38. Further, emphasizing the broad purpose of Rule 2004, courts permit examination of any third party that has knowledge of the debtor's affairs or who can be shown to have had dealings with the debtor. *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y. 1993) ("Because the purpose of the Rule 2004 investigation is to aid in the discovery of assets, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation."), *aff'd*, 17 F.3d 600 (2d Cir. 1994); *Valley Forge*, 109 B.R. at 674.

39. Here, the predicate for the examination sought by the Indenture Trustee has been clearly established, and the subject matter of the discovery lies well within the ambit of Bankruptcy Rule 2004. The Indenture Trustee is seeking to investigate the actions of Shenton Park that will have the effect of impairing the assets of the Debtors. As discussed above, if Shenton Park is allowed to liquidate Caucuscom, an ITC Change of Control will occur and,

therefore, the Debtors will no longer be contractually entitled to receive the regular Minimum Dividend Payments.

40.  Any investigation that may bring substantial assets into the bankruptcy estate and relates to potential mismanagement or conflicting management clearly relate to the "acts, conduct, or property . . . of the debtor" as required by Rule 2004. Indeed, the Indenture Trustee's inquiry into Shenton Park's attempt to deprive the Debtors of bargained-for control rights and impair the Debtors' ability to realize value and pay creditors goes to the very purpose of Rule 2004, which is to compel examinations that help preserve the rights of stakeholders.

41.  Having met the predicate for relief under Rule 2004, the Indenture Trustee seeks authority to request from Shenton Park the production of those documents identified in Schedule 1 to Exhibit A (collectively, the "Document Requests"), which relate to a) the dissolution proceedings initiated by Shenton Park in the British Virgin Islands; b) disabling conflicts of interest that may be motivating Shenton Park's actions; and c) other efforts by Shenton Park to depress the value of assets of the Debtors.

42.  Each of these topics is appropriately the subject of discovery in these proceedings and has been narrowly tailored to minimize Shenton Park's burden in collecting and producing responsive documents. It is crucial that the Indenture Trustee be granted access to key information about Shenton Park's intentions in filing an action that would directly hurt the Debtors' equity interest.

43.  The purpose of the Document Requests is to help the Indenture Trustee determine whether the facts and circumstances surrounding Shenton Park's attempt to liquidate

17

Caucuscom and possible relationships with various parties give rise to viable claims that the Debtors may assert for the benefit of their estates and unsecured creditors.

44. The Indenture Trustee has previously sought to obtain the information without Court intervention, but those efforts were unsuccessful. Accordingly, to preserve the value of the estate and the important rights of unsecured creditors, the Indenture Trustee now requests that the Court order Shenton Park to produce the information.

45. If it becomes necessary, the Indenture Trustee may also seek to conduct depositions of Shenton Park's representatives concerning the topics covered by the Document Requests. Therefore, the Indenture Trustee requests that the Court compel Shenton Park to make their representatives with knowledge of the relevant transactions available for deposition by the Indenture Trustee on fifteen (15) days written notice to their counsel.

46. Upon receiving and reviewing the documents responsive to the Document Requests, the Indenture Trustee may determine that further discovery is necessary to complete the investigation. Because the scope of such additional discovery cannot be fully determined until after the Indenture Trustee has had a meaningful opportunity to review the documents, the Indenture Trustee respectfully requests that the Court authorize the Indenture Trustee to conduct, without further order of this Court, additional reasonable discovery from Shenton Park in connection with the ongoing investigation of potential avoidance actions, including, without limitation, additional reasonable document requests and depositions.

47. The Indenture Trustee believes that all of the discovery sought herein is critical to preserving the rights of the Debtors and the creditors. The Indenture Trustee believes that the relevant documents and information are uniquely within the possession, custody, or control of Shenton Park and cannot readily be obtained from other sources. The Indenture Trustee

reserves its rights, however, to request and/or to conduct further discovery, pursuant to Rule 2004 or other applicable law, from any person or entity, including, without limitation, Shenton Park.

### CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 2004-1

48.  As described more fully Exhibit B attached hereto, the requirements of Local Rule 2004-1 have been satisfied in this instance.

### NOTICE

49.  Notice of this Motion has been given to: (a) counsel to Shenton Park; (b) the Office of the United States Trustee; (c) the Unsecured Creditors Committee; and (d) all parties requesting notice and service in these cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Indenture Trustee submits that no further or other notice is required.

### NO PRIOR REQUEST

50.  No prior application for the relief requested in this Motion has been made to this or any other Court.

## CONCLUSION

WHEREFORE, the Indenture Trustee respectfully requests that the Court grant this Motion and enter an order, substantially in the form of Exhibit A, (i) authorizing the Indenture Trustee to examine and obtain discovery from Shenton Park, pursuant to Rule 2004, regarding the facts and circumstances surrounding regarding certain potential claims (ii) directing Shenton Park to produce the documents identified in the attached Schedule 1 to Exhibit A, (iii) requiring Shenton Park's representatives to appear for requested oral examination(s), (iv) authorizing the Indenture Trustee to conduct additional discovery as appropriate, and (v) granting such other relief as is just and proper.

Dated: August 19, 2015

PACHULSKI STANG ZIEHL & JONES LLP

/s/ *Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
    crobinson@pszjlaw.com

-and-

MILBANK TWEED HADLEY & McCLOY LLP

Gerard Uzzi (*pro hac vice*)
Bradley Scott Friedman (*pro hac vice*)
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 822-5000
Email: guzzi@milbank.com

*Counsel for The Bank of New York Mellon*

20